My name is Joseph Mueller, and I represent Petitioner Hugo Aguilar-Cuculista, whom, for brevity, I shall refer to as Mr. Cuculista. Before I begin, I'd like to reserve one minute for rebuttal. Your Honors, this is the unusual case in which this Court should not defer to the decision of the Board of Immigration Appeals, because this decision was marked by a failure to appreciate the legal significance of the uncontested evidence, a failure to apply the controlling law, improper speculation, and distortion of the factual record. This morning, I'd like to focus on the BIA's errors with respect to its adverse credibility determination. Simply put, this determination cannot be reconciled with the uncontested evidence that Mr. Cuculista was threatened with death by guerrillas on account of political opinion. In particular, neither the BIA nor the government's attorneys has contested the admissibility, authenticity, or veracity of the death threat letters sent to Mr. Cuculista by the guerrillas. I would direct the Court's attention to page 72 of the administrative record, at which time Mr. Cuculista's introduced the death threat letters, and the government stated, and I quote, I don't have any objection to that admissibility, and that's with respect to Exhibit 3, the death threat letters. Well, may I ask you a quick question, Counsel? He got initially two death threat letters. Well, I guess he got three. He produced two, and then later produced one. Is that right? That's correct, Your Honor. He produced a third that he obtained during the pendency of his appeal. All right. Now, when he was questioned about these death threat letters, it's my understanding from the record that he really couldn't remember what was in them. Your Honor, he could not provide a verbatim recitation of the death threat letters. Well, look, according to the judge, he didn't remember not only a verbatim recitation, he didn't remember even the substance of them. Well, it's clear he remembered that he was threatened with death. The immigration judge created a false distinction between Mr. Cuculista's ---- Even a liar would remember that. I'm sorry? Even if the letters were fabricated, he'd remember that, because, you know, that was the whole point of the letters. The point of the I.J.'s finding, I think, of Judge Ezold's question is, if he can't remember the details about the letters, doesn't that support the conclusion that the letters were fabricated? Your Honor, there's no finding in this record, and there's no argument by the government that these letters were fabricated. In fact, there's a thing ---- Well, I think, you know, I think it's pretty clear that's what the I.J. found. I mean, by finding that he doesn't believe Petitioner, he ---- and it's clear that's the government's position. You know, he presents these pieces of paper, which he reports to be death threat letters, but they're fabrications. Your Honor, at page 36 of the administrative record, the Court discounts the legal significance of the letters, but the Court also finds he did receive them. And I'm going to quote here. The Court would not find, based on the two notes received by Respondent, that the form of harm reached the level referred to as persecution. You're quibbling. You're quibbling. Well, Your Honor, there's no ---- Well, clearly, clearly, if the I.J. had found these to have been letters, I mean, could have been received by him from his wife, right? I mean, they were received. Clearly, if the I.J. believed that he got these letters from guerrillas, he would not have said what he said. He would not have found your point to be incredible. The whole point of saying, look, he can't even remember what's in the letters is to suggest that they're fabrications. Your Honor, again, this Court is limited to affirming the I.J. only on grounds that are articulated in the opinion, and there is no articulated finding. The finding is that your client fabricated and that your client is not credible. Well, again, the I.J. finds the ---- finds Mr. Kuglista, his credibility to be lacking with respect to certain issues, but not with respect to the veracity of the letters themselves. There's no finding in the opinion that the letters are not genuine, they were fabricated, that they were forged. The government makes no argument that they were in its briefs. Well, don't they make the argument that didn't the I.J. find that one of the basis for denying him asylum was that he lacked credibility because he didn't even mention the letters in his claim for asylum? That's correct, Your Honor. So aren't the letters, isn't this support exactly what Judge Kosinski just said? That's correct, Your Honor. And, in fact, that is the central factor which underpinned the BIA's adverse credibility determination. I think that's revealed by page 35 of the administrative record. And, again, I'm going to quote the final paragraph. An applicant's failure to make any reference on an initial asylum application to experiences which he described in subsequent statements as essential to a persecution claim is sufficient to support an adverse credibility finding. These omissions, in addition to the Respondent's many inconsistent, contradictory and responsive statements, would cause the Court to make an adverse credibility finding. Now, what this passage reveals is two things. First, that the failure to attach the letters to the initial application loomed large in the BIA's adverse credibility determination. Indeed, it's impossible to determine if the BIA would have reached that determination in the absence of that fact. The way in which this is articulated, the BIA does not say the other contradictions were independently sufficient to support an adverse credibility determination. You know, we have lots of cases that say even if a series of credibility findings by the I.J. and we find some of them not persuasive, if there's one or two that are, that's enough. That's correct, Your Honor. We never send back for re-weighing, saying, okay, we've sort of knocked out these would-you-still-find-them-not-credible. So, you know, if the I.J. finds them not credible, probably finds them not credible  That's correct, Your Honor. But with respect to the central finding in response to Judge Ezra's question, it's clear that that was in error. This Court has never held that one must attach all documentary evidence to the initial asylum application. Right. But you're not addressing an issue that we have nasty about. I mean, if you want to waste your time on it, that's fine. But you don't have to persuade us of that. We know the law. So you can assume that we, I mean, I'm a college, but you can assume we've read the cases and my colleagues read the cases the same way as I do. And it's fine. That determination is not any good. But, again, there's different You know, you can talk about it if you want, but your clock is ticking. Sure. The other issues on which the I.J. and the BIA focused were also immaterial, and legally so. For example, the BIA's requirement or criticism But you agree that if the finding as to the inability to remember the letters is material and supported by the record, that's enough to find your client incredible and support the basis for denial of the claim, no? I would not agree with that. Okay. Why don't you explain that? Sure. First of all, the failure to remember the exact text of the letters, if anything, demonstrates that he did not create those at that time or fabricate those at that time. If he had fabricated them just prior to the hearing, then he would have had a better memory of what their contents were. Moreover, when the BIA was discussing the purported conflict between his testimony and the letters, the BIA established really a false distinction between what he testified and what the letters stated. And in particular, the BIA said that he testified that he had been threatened because of his refusal to collaborate with the guerrillas. And the BIA contrasted that with the death threat letters text, which stated that he had been threatened with death because of his loyalty to the government. But in fact, those are one and the same in this case. He was periodically over a period of years approached by guerrillas who attempted to gain his collaboration. He rebuffed those overtures. And the conclusion drawn by the guerrillas eventually was that he was an incorrigible government loyalist, and at that point they began to threaten him. But, counsel, aren't those two different things? Because isn't our case law clear that failure to join a guerrilla group is not persecution? That's correct, Your Honor. That is what the case law states. And if that's all we had on this record, then the IJ's decision would be supportable. But we have, in addition to the refusals to collaborate, the conclusion, the explicit conclusion drawn by the guerrillas, which is that he was a government loyalist. Now, there are a variety of reasons why you might choose not to collaborate with guerrillas. Even if you supported their cause, you may not want to lay down your life for the cause. But here we have proof, direct documentary proof, that the guerrillas drew from his refusals to collaborate the conclusion that he was a government loyalist. I thought you said those were one and the same. In this case, they are. In this case, they are one and the same. There are other cases where one could imagine different facts. But in this case. Counsel, this is your imputed political opinion claim. Government argues, and it sounds like a pretty good argument, that this isn't even in the case because he didn't raise it to the BIA. Your Honor, in his application to the BIA, he claimed that his proof met the standards for persecution. Again, he's representing himself pro se in that he did not recite all of the elements of the statute. No. I mean, he raised the claim that he was being persecuted for having been a member of this government organization. He does not. I've read the petition to the BIA carefully a couple of times, and I don't see anything in there claiming imputed political opinion. Those are different issues and different claims, and the government would have different arguments in opposition to those. As best I can tell, those things were not raised. They were not addressed by the BIA, and I don't understand how you can raise them here. Well, at the outset of his application, he did make clear he was claiming political opinion. On page 128 of the administrative record, he checked the box, political opinion. He said the political opinion in particular was against communism, which is a reference to the leftist politics of the guerrillas. So it is clear that from the outset of these asylum proceedings, that has been his claim, that he was threatened with death. Oh, I'm sorry. This is in his initial application. That's correct. And at the point he raised it to the BIA. The I.J. DeRouze on it, you know, was presented with the issue. But then when he goes to the BIA, he has a choice as to how many which claims to raise. He doesn't raise this claim. Why isn't that broad? I mean, he didn't take an administrative appeal. Didn't raise it in his initial brief to us. I mean, you tried to salvage it in your supplemental brief, which is very good. But it may be too late. Well, Your Honor, two points, I think. First, he was representing himself pro se at the BIA. Second, the political opinion holding, to the extent there was one, was really sort of an alternative holding in the I.J.'s opinion. It was buried beneath the finding that this did not constitute persecution and the adverse credibility determination. So to expect a pro se applicant to reach really a third alternative holding or a second alternative holding imposes quite a high standard. And this Court has held in, I believe, the Lim case that where the supplemental briefs were. Lim dealt with the question of what happens if you don't raise it in your initial brief before this Court. And we said, well, if you then have a pro se and then you have experienced counsel come in and raise it in a supplemental brief and the government has a chance to respond, then it's fair because the government has a chance to respond. But if it's not raised before the BIA, you have a different kind of problem because the government then doesn't have a chance to respond to it before the BIA. So you especially sneak an issue in as to which the government, you know, didn't have a chance to present an argument. So Lim does not cover this case. That's a fair point, Your Honor. Lim could be extended, perhaps, but I, you know, it does present different issues. That's a fair point, Your Honor. But again, this is, this was at the BIA level a pro se applicant, and this would be the second alternative holding that he would need to deal with. Well, perhaps we should hear what the government has to say. Thank you. Please, the Court. Donald Hubion for Respondent. Your Honors, there are several hurdles in this case that the Petitioner has to cross, and its credibility is only the first. In regard to that first issue, however, the Court was told that there was a false distinction made by the fact finder between the testimony and the letter. It's really one letter. It came two times the same day, and one typewritten, one handwritten. Well, there were three. There were two letters, actually. There were two. Because one came later. It's the same letter. It arrived twice the same day. But then there was a subsequent letter. But that was never before the fact finder. That was proffered by the Petitioner himself to the BIA. And it was improperly proffered. It's not properly in the record. And it's not been considered by the fact finder. It came after the hearing. It was proffered as part of his appellate attached to, appended to his appellate brief, which was really a declaration since he was pro se. And I seem to remember that one of the bases for the judge's ruling below was changed country conditions. Yes. And the fact that his family apparently had been living down there through all of this and had never been molested or bothered in any way. Yes, Your Honor. That was another point that I was going to get to. In fact, I'll go beyond credibility if you wish. Well, that's fine. Although I do have a question about credibility. I'm not entirely sure why the fact that he couldn't remember what the letter said is all that important. I mean, he had the letters before the hearing. He could have read them and, you know, they're fabricated. As far as counsel points out, he'd be more likely to remember what's in them. One thing that hasn't been mentioned is that he got the wrong letter. He got the wrong letter. What I mean by that is that. What do you mean by that? I mean, Your Honor, is that the letter. It was meant for the guy next door. They really meant to threaten the guy next door. Well, in substance, it was for this reason. The letter says, in so many words, cease collaborating with the military and being loyal to the government. That's it. Or you'll meet harm. That's it. It has nothing whatsoever about work with us, help us, give us information. Because now we found out that you were in intelligence. Because they had left him alone pretty much all the years he was farming. They knew he had been in the Army and they tried to recruit him and he said, I don't want to do it. And they left him alone. It was only at the end that this threat business arose. So this letter says nothing at all about what he testified to. And that's exactly what the fact finder principally relied upon in what was mentioned by the court this morning in argument. The testimony had nothing to do with what was in the letter. The testimony was, you have information that we now want. We found out you were in intelligence. Tell us. Work with us. Collaborate. He uses the word himself in testimony five times. He says collaborate, collaborate, collaborate, collaborate, collaborate. And his attorney cannot get from him or lead him to anything else until it's cross-examination when he says, well, you know, actually during the first several years I was there, they bothered me to join them. So it didn't come to anything. That aspect of it didn't. But like I said, the letter seems to have got to the wrong guy because as the fact finder properly held, they don't mesh. They don't, it doesn't. Well, the fact finder actually found that apparently as I read the record and my colleagues may view it differently, but it looks to me that he found that even if this was not fabricated and the letter was true, that all he received were some threats, not that they were inconsequential, but that he wasn't actually persecuted for any of the basis which would constitute a legally sufficient ground for asylum. Those were the further findings, which was that even if true, it doesn't rise to the level of persecution. And even if it is persecution, it's not on account of your political opinion. Your political opinion, according to the testimony, had nothing to do with it. They were after information that could be of use to them. And why? Because he had been of intelligence. And why for that? Well, it's obvious. What's the governor's position as to the letters? Were they fabrications or what? The IJ does not say they're fabrications. The IJ does not. But she does. I mean, let's say they went to the wrong guy. I'd still be worried. You know, if I got a letter at home threatening me with death and, you know, they got the wrong judge. I really meant to send it to Judge Reinhart. But, you know, they got me. I'd still be worried, you understand. Well, of course. We're often confused for each other. And it wouldn't do me any good if they carried out the threat. I mean, you see what I'm saying. Of course. If the letter was really received and said the wrong thing, it doesn't really help the government very much. So do we have to infer that the IJ saw the letters were fabrications? Is that what's going on? I mean, the IJ doesn't say they were fabrications. No, she doesn't. She leans heavily or primarily on the fact that the letters are belated and that they have nothing to do with what he testifies to. Well, I understand she says that. But what? Okay. So they are belated. That doesn't count for very much, as you know. Yes. What do we make about this fact that they don't have much? What? So what? Okay. So that's what she finds. Do we say, well, but she doesn't find the letters of fabrication, so we have to assume the letters were received. Or which, you know, would lead to one series of conclusions. Or do we have to say, even though she doesn't say they're fabrications, we must infer that she found. We must make an inference. We must draw an inference. Well, of course it could be inferred because he's found incredible, and so she's not going to believe. But that's the next step, whether we can do that. That's what we must do, isn't it? If we're to uphold the IJ on that chain of reasoning, we'd have to say that implicitly she found the letters to be fabrications. If we don't, if the letters are genuine, then he really does have threats and we have to go to the next step. It doesn't matter what he classified or whatnot, right? Yes, Your Honor. That is a necessary step in our analysis. Yes. Okay. Now, can we? Have we ever found implicit findings of credibility like that when the IJ doesn't say it's a fabrication? Have we ever imputed that to an IJ? Have you ever imputed an implicit credibility finding or an incredibility finding? Well, specifically, she finds him to be not credible. Yes. Let's say we accept that. We still have the letters. So what we have to impute is not simply that he is incredible, but he also fabricated the letters. Either he did or his wife back home in Guatemala did. I mean, maybe she manufactured the letters. Maybe it's his request and sent it to him. But somehow these are fake letters. We have to impute to the IJ a finding that the letters are fake, which she does not make herself. And I think you've conceded that that's what we'd have to do. And I'm asking you, have we ever done this? Is there a case that allows us to impute fabrication, a finding of fabrication when none is made by the IJ? I don't know, Your Honor. It's sort of a steep leap. I understand. I don't recall such a case. I frankly don't know. It's a little troubling, isn't it? Yes. Do you want to go to the next step? Yes. Let's go to the next step of the analysis. All right. Well, I was simply going to say that, as I had mentioned, that beyond credibility, you've got the nature of the threats. Well, if you believe them, they threaten to kill us. Yes. It's threats without plus, which is sort of what it takes, you know, to make a threat into. Well, we've got lots of cases that say death threats are enough. Well, but you've also got, you know, our best case is the Lim case where the facts are, as I guess you could say, as good as in the cases on the other side of the fence, but the court finds that it's not, the threats are not sufficient. Then whether or not it's on the count of anything political, and then finally, or not finally, then you've got the fact that he solves his own problem by relocating and leaves his family safely in his hometown and goes El Norte. But that goes to the question of likelihood of future prosecution, as to which the IJ didn't make any findings. Right. That's correct. Really, your best argument seems to me, once we get past the credibility findings, if we don't agree with you on the credibility findings, is that the imputed political opinion point is nobody before us. Yes. Well, that's certainly a very good one, but there's also the change function issues. If we were to accept that, he still has made out a case that he was being persecuted for having been in the army. He wasn't being persecuted for being in the army. They were after him. Having been in the army. They were not out to punish him for being, for doing anything for the government. According to his testimony, they wanted information. That was what he said. He said, they only threatened me, that's all. He said, they wanted me to collaborate because I know a lot. So the point is that they were not after him because he was in the army. He was after him because he got information. Yes. Which he happened to get because he was in the army, but he could have gotten some other way. Well, they wanted the information, apparently, in the job he held when he stopped being an infantryman, a rifle carrier. He was, he worked in some kind of intelligence work for a year thereafter. Army intelligence. Apparently. And if that's possible, I mean. I understand. But by the time he got to his hearing in 1999, peace reigned. I mean, peace broke out in 19- Well, we can't reach that. 96. Because I.J. made no findings as to future. She does. She does. She does comment on the profile, which. She mentions it. Yes. But it's clearly not tailored to his situation, and the government would have to. She certainly could have said more. She could have said more. Yes, for sure. Could have said less, too, on some other points. Well, that's another good point, Your Honor. She certainly could have. Okay. Thank you. Thank you, Your Honor. Your Honor, out of time, we'll give you a minute for rebuttal. But just a minute. Sure. Your Honor, the chief point I'd like to make in rebuttal is that it's not too much to expect the BIA to articulate the actual grounds for the decision. If, indeed, the BIA bases its decision on a theory that the letters were fabricated, it should have said so. That would have given Mr. Kouklis an opportunity to brief the issue at the Board of Immigration Appeals, an opportunity for counsel on appeal to brief the issue. It was not a finding made by the immigration judge, and to impute that finding would be improper as a matter of policy and also contrary to the case law, which holds that this Court can only review the grounds that are actually articulated. One quick point on the Lim case. It is true that there is a conflict in this Court's case law as to whether death threats standing alone constitute persecution. But the definition for refugee requires a showing of persecution or a well-founded fear of future persecution. And there can be no reasonable dispute that a letter threatening to kill the asylum applicant issued by a notoriously dangerous guerrilla group would create a well-founded fear of future persecution. What's your best case authority for that proposition? One case, for example, would be the Aguilar-Arcota case. What's your best case? That is one of our best cases. Our three best cases are Aguilar-Arcota, Garavias, and Del Carmen Molina, although I will note the latter two don't characterize it as persecution rather than in terms of a well-founded fear. But even the Lim case, which was relied on by Respondent, held there was a well-founded fear of future persecution. Is that the issue in this case? Is there a – there was no finding regarding whether or not there was a well-founded fear of future persecution. That's correct, Your Honor. And it was error of the BIA not to reach that issue. It was plainly – But that being the case, we can't rule on that now, can we? Well, you could remand the case to allow the BIA to address whether the death threat letters created a well-founded fear of future persecution. But the decision cannot be affirmed without that issue being addressed. It was plainly a live issue. And that is the best rationale for the Petitioner's asylum application, that you had a well-founded fear of being murdered by guerrillas, a well-founded fear of future persecution. All right. Okay. That's a fair point. Thank you. The case is now able to stand for a minute. The next case on the calendar is –
judges: Canby, Kozinski, Rawlinson